Filed 9/27/13  P. v. Williams CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>HENRY DON WILLIAMS,<br><br>     Defendant and Appellant. | A130138<br><br>(Solano County<br>Super. Ct. No. FCR259067) |

A jury found defendant Henry Don Williams mistook Fairfield city councilman Matt Garcia for a methamphetamine dealer who owed a friend $50, and shot and killed him in the driveway of a home in Fairfield.  Defendant maintains his first degree murder conviction should be reversed because the trial court erred in denying his change of venue and *Batson/Wheeler*[1] motions, abused its discretion in admitting certain evidence, and erred in failing to instruct the jury accomplice testimony or statements required corroboration.  He also complains of prosecutorial misconduct, ineffective assistance of counsel, and cumulative error.  We affirm the judgment and, in a separate order, address defendant's petition for a writ of habeas corpus in case No. A137201.

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

1

## PROCEDURAL AND FACTUAL BACKGROUND

Defendant bought cocaine and methamphetamine from a friend, Ryan Estes, and introduced Estes to another friend, Gene Combs, who also purchased methamphetamine from Estes.

Around 3:00 p.m. on Labor Day, 2008, Combs called Estes and asked to buy $50 worth of methamphetamine. The men met at a restaurant, where Combs gave Estes $50 and Estes agreed to meet Combs with the methamphetamine in about an hour. Instead, Estes bought beer with the money and spent about two hours drinking in his garage with some friends. Defendant eventually arrived, had a beer, and then left.

Combs called Estes around 5:00 p.m., asking about the methamphetamine. Estes told him to wait a few hours. During the course of the evening, Estes received about 15 angry phone messages from Combs, including one in which Combs threatened to burn down his mother's house. Later, there was a voicemail message saying " 'Those bullets were meant for you.' " Estes could not tell if the message was from Combs or not; "it could have been [defendant] or Combs." District Attorney Investigator Kurtis Caldwell testified that when he interviewed Combs, he admitted leaving Estes the "bullets were meant for you" message.

The same day, defendant and his girlfriend, Nicole Stewart, went to a barbeque in Berkeley at the home of Armail Porter. Defendant showed Porter a box containing a semiautomatic handgun. After defendant and Stewart left, they drove to see Estes in Fairfield. Defendant spoke with Estes, then returned to the car where Stewart was waiting.

Defendant and Stewart then drove to a Popeye's restaurant in Suisun. While the couple was in their car, Combs arrived and got in the backseat. Defendant told Stewart Combs "had to get . . . his money back from [Estes]." Combs "was upset because [Estes] had taken his money without giving him whatever he had asked . . . ." Both men were agitated, and a decision was made "that we were going up there [to Estes's house] to get the money." With Stewart driving, the trio left for Estes's house, about six miles away on Silverado, in Fairfield.

2

When they arrived at Estes's house, defendant went to the door carrying a black case while Combs remained in the backseat. Defendant spoke with someone at the house, then returned and reported Estes was not there. Stewart made a U-turn and drove away, back down Silverado. Defendant then told her to pull over, which she did. Defendant got out of the car and walked behind it, while Combs stayed in the backseat. Shortly thereafter, Stewart heard three gunshots. Combs told her to start the car, and defendant got into the passenger seat holding his shirt, saying "Go." He told Stewart to take him to his mother's house in Fairfield, then take Combs back to his car near Popeye's, and then return to his mother's home.

While Stewart was driving Combs to his car, she asked "if [defendant] had shot somebody." Combs told her "[n]ot to worry about it. Just drive." After dropping him off, Stewart returned and found defendant at the home of Francisco Perez, who lived next door to defendant's mother. Defendant and Stewart left after "[n]ot very long," and Stewart drove them to their apartment. Stewart did not ask defendant any questions about what happened because she was scared.

Bobby Lee White, one of defendant's neighbors, testified defendant arrived at his apartment around 9:00 p.m. that night and told him " 'I had to unload my clip on someone.' " Defendant appeared to be drunk. About half an hour later, defendant asked him if he had told anyone what he had said.

Defendant spent the night at the apartment, and left the next day. He did not tell Stewart where he was going, but she suspected he had gone to Las Vegas. He had previously purchased tickets to Las Vegas which were on his desk, and they were gone.

Defendant claimed he was only helping Combs collect a debt that evening. Combs had not mentioned "anything about a dope deal" with Estes, and he did not know Combs was planning to shoot him. In fact, he did not know Combs had a gun. According to defendant, it was Combs who exited the car on Silverado after they left Estes's house. He heard shots, and Combs got back in the car and "said . . . to drive." Combs also gave him the gun. When they reached Perez's house, defendant went inside, and Combs and Stewart drove away. Defendant told Perez to "hold on to" the gun, which

3

was wrapped in defendant's shirt. Later, he told Perez to "throw the gun in the water." When Stewart returned, she and defendant went back to their apartment. He then saw Bobby Lee White, a neighbor, and told him "I'm about to go bad on my mechanic . . . [b]ecause he just jumped out of my car and just unloaded a clip on somebody." Defendant referred to Combs as his mechanic.

The next day, defendant received a phone call from Estes and went to Berkeley and stayed with Porter for a night. Porter later told a Fairfield police officer in a recorded statement defendant told him " 'I fucked around and I shot the councilman.' "

The following day, defendant took a bus to North Carolina, where he stayed for about 12 days. He returned to the San Francisco bay area because he heard the police had been at his mother's house. He stayed one day, and then went to Las Vegas because he "was just upset about the whole thing." Defendant was arrested in Las Vegas on September 20, where he was representing himself as a displaced hurricane victim from Houston named Shiferaw Kollasie.

A jury convicted defendant of first degree murder, and found true the allegation he personally and intentionally discharged a firearm.

**DISCUSSION**

*Motion to Change Venue*

Defendant claims the trial court erred in denying his motion for a change of venue. He contends the "significant pretrial publicity" surrounding the killing of the city councilman was "essentially a local version of the . . . mourning following the death of John F. Kennedy," denying him the right to a fair trial.

"[T]he court shall order a change of venue: [¶] . . . when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county . . . ." (Pen. Code, § 1033, subd. (a).) The court considers five factors in making that determination: " '(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim.' " (*People v. Farley* (2009) 46 Cal.4th 1053, 1082 (*Farley*).) " ' "We will sustain the court's determination of the relevant facts where supported by

4

substantial evidence.  We independently review the court's ultimate determination of the reasonable likelihood of an unfair trial." ' [Citation.]" (*Ibid.*)

Defendant complains the trial court failed to hold a hearing at which his expert could testify about the results of a survey, which showed 90.5 percent of surveyed Solano residents had heard about the murder.  He cites no authority requiring an evidentiary hearing, which in general is held only if "necessary to resolve material, disputed issues of fact." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415.)  And in any case, the trial court not only considered the expert's report, it accepted "what Dr. Bronson says.  I accept it on face value. . . .  I'm not . . . challenging his survey in any way, shape or form.  I accept what he has presented."  Furthermore, " '[t]he relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' (*Patton v. Yount* (1984) 467 U.S. 1025, 1035 . . . .)  'We must distinguish between mere familiarity with [the defendant] or his past and an actual predisposition against him.' [Citation.]  . . .  ' "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . ." ' " (*Farley, supra,* 46 Cal.4th at p. 1086.)  Thus, the California Supreme Court has upheld denials of change of venue motions in cases where the vast majority of prospective jurors had heard about the case.  (See *People v. Ramirez* (2006) 39 Cal.4th 398, 432–433, 435 (94.3%); *People v. Proctor* (1992) 4 Cal. 4th 499, 524–526 (80%); *People v. Bonin* (1988) 46 Cal.3d 659, 675–677 (85%), overruled on another ground as stated in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)  "[T]here is no requirement that jurors be totally ignorant of the facts of a case, as long as they can lay aside their impressions and render an impartial verdict." (*People v. Lewis* (2008) 43 Cal.4th 415, 450.)

Defendant next asserts the first change of venue factor, the nature and the gravity of the offense, "weighed in favor of a change of venue" because it was a murder of an elected official.  Murder is always a grave offense, but "[t]he same could be said . . . of most capital crimes, and . . . this factor is not dispositive." (*Farley, supra*, 46 Cal.4th at p. 1083.)  "Indeed, on numerous occasions we have upheld the denial of change of venue

5

motions in cases involving multiple murders." (*Ibid*.) While the murder in this case was of an elected official, that fact does not change the nature of the killing for the purposes of venue analysis. Garcia was murdered in a case of mistaken identity, not targeted because he was a city councilman.

Defendant also maintains the extensive publicity about the murder mandated a change of venue. He notes there was widespread press coverage of the murder, and it was "the top news story of 2008 in the area." While the news coverage was extensive, the vast majority of the articles in the record were "largely factual" rather than inflammatory, a factor the court may consider. (*Farley, supra,* 46 Cal.4th at p. 1083.) Indeed, defendant does not identify any of the 692 articles in Exhibit A as being inflammatory. The bulk of the newspaper articles mentioning Garcia were about the youth center and scholarship fund bearing his name, and were unrelated to the trial. The court found "most of the press within the last year is press about the youth center or the Matt Garcia Foundation, which is talking about keeping Mr. Garcia's dream alive, having events for youth." The court further found "the overwhelming majority of the press is fairly neutral and factual," and noted "the majority of the critical press . . . was more critical of the District Attorney's . . . decision to provide immunity to . . . the driver in this case . . . ."

Defendant also contends Solano County is a small community where the crime had " 'obviously become deeply embedded in the public consciousness.' " "[M]otions to change venue have been granted where the county is relatively isolated and small. (See, e.g., *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 582 . . . [Placer County, population 106,500]; *People* v. *Tidwell* (1970) 3 Cal.3d 62, 64 . . . [Lassen County, population 17,500].)" (*People v. Webb* (1993) 6 Cal.4th 494, 514.) Solano County is not isolated, but "bisected by the heavily traveled Interstate 80 corridor between San Francisco and Sacramento, is no more than 45 miles from either of these large urban areas." (*Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301, 313, fn. 3.) It also had a population over 400,000. (*Ibid*.)

6

Defendant next maintains his status in the community militated in favor of changing venue. A change of venue may be necessary where the defendant is "associated with an organization or group which aroused community hostility." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1002.) There is no evidence defendant was a member of "an unusual subcultural or unpopular group." (*Frazier v. Superior Court* (1971) 5 Cal.3d 287, 290, 293–295 [defendant was a "hippie" and county felt deep-seated antagonism toward such individuals]; *People v. McKee* (1968) 265 Cal.App.2d 53, 59, [defendant was associated with Hell's Angels group].) The trial court found defendant was an "African-America [man] in a community that is very diverse, and there does not appear to be anything about [his] status in the community which would promote any sort of hostility to [him]."

Defendant also asserts Garcia's prominence was a significant factor. He claims Garcia, was "a person of high importance, the youngest councilman in Fairfield history." As an elected official, Garcia had some prominence in Fairfield at the time of his murder. The court found, however, he "was a fairly newly-elected City of Fairfield City Councilman." There was no evidence he was well-known throughout all of Solano County, or that, as defendant claims, Garcia "attained the status of celebrity while living." As the court found, "I think it is fair to say that [Garcia] has had a greater impact posthumously than he has before his passing, . . . he was a young man; he did not have perhaps the time to have a greater impact on the community . . . ."

In sum, there is no merit to defendant's challenge to the denial of his venue motion. Substantial evidence supports the trial court's factual findings, and our independent review of the record demonstrates he did not meet his burden of establishing a reasonable likelihood he could not receive a fair and impartial trial in Solano County.

*The* **Batson/Wheeler** *Motion*

Defendant claims the trial court erred in denying his *Batson*/*Wheeler* motion, claiming the prosecutor's peremptory challenge of two potential jurors, one of whom was Hispanic and the other African-American, violated his constitutional rights.

" ' "Review of a trial court's denial of a [*Batson/Wheeler*] motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' " ' [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 165.)

A " 'prosecutor, like any party, may exercise a peremptory challenge against anyone, including members of cognizable groups. All that is prohibited is challenging a person *because* the person is a member of that group.' " (*People v. Jones* (2011) 51 Cal.4th 346, 369.) " 'It is well settled that "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]" ' [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 447.)

"The three-stage procedure of a *Batson/Wheeler* motion is now familiar. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' " (*People v. Williams* (2013) 56 Cal.4th 630, 649, quoting *Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

" ' "[T]he critical question in determining whether [a party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." [Citation.] The credibility of a prosecutor's stated reasons [for exercising a peremptory challenge] "can be measured by, among other factors . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citation.]' [Citation.]" (*People v. Cowan*, *supra*, 50 Cal.4th at p. 448.) " ' "So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" ' [Citation.]" (*People v. Jones, supra*, 51 Cal.4th at p. 361.)

Defendant made his first *Batson/Wheeler* motion after the prosecutor exercised a peremptory challenge to excuse E.O., a Hispanic woman. Defendant asserts "[E.O.], when questioned by the prosecutor, was asked repeatedly about the contacts with the criminal justice system with her friends and family. [¶] [She] was asked whether or not she has any contact with those people . . . . [¶] This was not the case with other individuals in the jury that do also have prior contacts with the criminal justice system. . . . [¶] For example, [Juror No. 9] had a DUI that he wasn't questioned about."

The record shows E.O. was questioned about her jury questionnaire responses, in which she indicated she had "relatives or close friends" who had been arrested and prosecuted. She stated her godfather was prosecuted for kidnapping, and a close family friend was accused of aggravated assault. When asked to quantify the number of people she knew who had been arrested, she responded "Probably more than I know that's been arrested." The prosecutor followed up with questions about her views of whether they were treated fairly and whether she still saw them, appropriate questions of a prospective juror. (*People v. Booker, supra*, 51 Cal.4th at p. 167, fn. 13 ["A negative experience with the criminal justice system is a valid neutral reason for a peremptory challenge."].) The transcript of these follow-up questions was about one and a half pages. This limited number of questions about people E.O. knew who had been arrested or prosecuted is not "evidence sufficient to permit the trial judge to draw an inference" of discriminatory

9

purpose, and thus no prima facie showing was made.  (*Johnson v. California, supra*, 545 U.S. at p. 170.)

Defendant also asserts prospective juror, T.P., an African-American, was "questioned differently" than other jurors about his contacts with the criminal justice system.

T.P. indicated in his jury questionnaire he had been either "accused of, arrested for, charged with or convicted of" attempted burglary in 1989.  In response to a voir dire question about whether he would have difficulty being fair and keeping an open mind, T.P. responded "I have a nephew that's in prison for using a gun, and it's just too close to home.  I mean, it's caused a lot of problems with my family, and I'll just have a hard time with it, I believe."  The court immediately asked if the "[p]arties stipulate to cause, or you want to further question?"  The prosecutor agreed, but defense counsel did not.  The court asked T.P. if he could "put those feelings aside," and he responded "You know, I could say that I would be willing to try, but I don't know. . . ."  The court then asked if his feelings would "overcome [his] ability to rationally see, hear evidence, and make a decision."  T.P. responded "I don't . . . at this moment, I don't think so . . . ."

Following the prosecutor's peremptory challenge of T.P. and defendant's *Batson/Wheeler* motion, the trial court found defendant had made a prima facie showing. The prosecutor then provided the following reasons for challenging T.P.:  "I don't keep social workers or counselors.  I don't keep helping people. . . .  [T.P.] is an addiction counselor; that's what he is, and I don't keep social workers.  I don't keep counselors, just like [E.O.]; she's a . . . case worker.  [¶] . . . [¶] [T]he reason why [T.P.] got asked the questions about this prior brush with the law, which I didn't explore very heavily, that's an . . . attempted burglary.  It just isn't some [driving under the influence] case.  [¶] . . . [¶] And I also don't keep jurors who have got tattoos; he's got a tattoo on his right arm. What it signifies, I couldn't tell you, but I don't keep tatted-up jurors."

The prosecutor's stated reasons for challenging T.P. were race-neutral.  (See *People v. Clark* (2011) 52 Cal.4th 856, 907 ["juror's experience in counseling or social services is a proper race-neutral reason for excusal"]; *Wheeler, supra,* 22 Cal.3d at p. 275

10

[juror's "clothes or hair length suggest an unconventional life-style"].)  Contrary to defendant's assertion, nothing in the record suggests the trial court did not make a " 'sincere and reasoned attempt to evaluate the prosecutor's explanation.' "  " 'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.'  [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 849.)  Indeed, as the court suggested, T.P.'s background and views may have been sufficient to challenge him for cause.

In sum, there is also no merit to defendant's challenge to the denial of his *Batson/Wheeler* motions.

### *Combs's Out-of-Court "Contextual" Statements*

Defendant sought admission of Combs's statement to an investigator that he left the "bullets were meant for you" message for Estes.  Defendant claimed Combs's statement supported the defense theory Combs was the shooter.  Prior to trial, the prosecutor stipulated to admission of the statement.  At trial, the prosecutor sought to introduce certain contextual statements Combs made to the investigator in the same interview under Evidence Code section 356.  Over defendant's objection, the trial court admitted statements by Combs that he was in the back seat of the Dodge Intrepid at the time of the shooting, he did not get out of the car, he "did not have a gun and . . . did not fire any shots."  Defendant maintains admission of these contextual hearsay statements violated the precepts of *Aranda/Bruton*[2] and *Crawford*,[3] and was error under Evidence Code section 356.

#### **Aranda/Bruton**

" 'The *Aranda/Bruton* rule addresses the situation in which "an out-of-court confession of one defendant . . . incriminates not only that defendant but another defendant *jointly charged*."  [Citation.]  "The United States Supreme Court has held that,

---

[2] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), abrogated by statute on another ground as stated in *People v. Homick* (2012) 55 Cal.4th 816, 874, footnote 34; *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

[3] *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

11

because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt, admission of such a confession *at a joint trial* generally violates the confrontation rights of the nondeclarant." [Citation.]  In this case, [declarant] was not jointly charged or tried with defendant, but was separately tried and convicted of murder.  Accordingly, the *Aranda/Bruton* rule does not preclude admission of [declarant's] extrajudicial statements against defendant.' " (*People v. Combs* (2004) 34 Cal.4th 821, 841.)

Since defendant and Combs were tried separately, the *Aranda/Bruton* rule does not apply.

**Crawford *and Evidence Code Section 356***

Evidence Code section 356 provides "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  (Evid. Code, § 356.)  " ' "In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry.  'In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with*, the admission or declaration in evidence. . . .' [Citation.]" ' [Citation.]  Further, the jury is entitled to know the context in which the statements on direct examination were made.  (*People v. Sanders* (1995) 11 Cal.4th 475, 520 . . . [where defense counsel elicited portions of investigative interview with witness, prosecution not foreclosed from inquiring into context of statements on redirect examination of witness and cross-examination of investigator].)" (*People v. Harris* (2005) 37 Cal.4th 310, 334–335.)

*Crawford* held the confrontation clause of the Constitution bars the admission of out-of-court "testimonial" statements except when the declarant is unavailable and the

defendant had a prior opportunity to cross-examine the declarant. (*Crawford*, *supra*, 541 U.S. at pp. 53–54.) The California Supreme Court has held statements otherwise admissible under Evidence Code section 356 are generally not made inadmissible by *Crawford*. (*People v. Vines, supra*, 51 Cal.4th at p. 862.) The court explained: "Nor, as defendant argues, would the confrontation clause of the Sixth Amendment to the United States Constitution have precluded the admission, under the hearsay exception embodied in Evidence Code section 356, of the portion of [defendant's accomplice's] statement that implicated defendant. In interpreting the requirements of the confrontation clause, the United States Supreme Court in *Crawford* recognized the continuing validity of exceptions, like the rule of forfeiture by wrongdoing, that derive from equitable considerations rather than an improper judicial determination of reliability. (*Crawford*[, *supra,* 541 U.S. at p. 62].) 'The *Roberts* test [(*Ohio v. Roberts* (1980) 448 U.S. 56, 66 . . . , overruled in *Crawford*)] allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one. In this respect, it is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability. For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability.' [Citation.] We conclude the rule of completeness also falls within this category." (*People v. Vines, supra*, 51 Cal.4th at p. 862; see also *People v. Parrish* (2007) 152 Cal.App.4th 263, 272 ["[B]y analogy to the rule of forfeiture by wrongdoing, . . . statements otherwise admissible under section 356 are generally not made inadmissible by *Crawford*."].)

Accordingly, defendant's reliance on *Crawford* is unavailing.

Defendant alternatively argues the contextual statements by Combs should not have been admitted under Evidence Code section 356 because they were not "on the same subject" as Combs's "bullets were meant for you" statement. As discussed, " ' "[i]n applying Evidence Code section 356 the courts do not draw narrow lines around

13

the exact subject of inquiry. 'In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with,* the admission or declaration in evidence. . . .' [Citation.]" ' [Citation.] Further, the jury is entitled to know the context in which the statements on direct examination were made. (*People v. Sanders*[*, supra*,] 11 Cal.4th 475, 520 . . . [where defense counsel elicited portions of investigative interview with witness, prosecution not foreclosed from inquiring into context of statements on redirect examination of witness and cross-examination of investigator].)" (*People v. Harris, supra*, 37 Cal.4th at pp. 334–335.)

Defendant sought admission of Combs's "bullets were meant for you" statement because it supported his defense theory Combs was the shooter. Thus, the "subject" was not merely whether or not Combs made the "bullets" statement, but what that statement suggested about the identity of the shooter. Defendant was not entitled to introduce that statement in isolation in order to give the jury the mistaken impression Combs admitted to being the shooter. Furthermore, the trial court gave defendant a choice outside the presence of the jury: He could introduce the statement and the contextual statements would be admitted, or he could decline to elicit the statement and the contextual statements would not be admitted. This evidentiary ruling was not an abuse of discretion.

Defendant also claims the prosecutor committed misconduct in the form of "sandbagging" by indicating he had no objection to introduction of Combs's "bullets were meant for you" statement, and subsequently moving under Evidence Code section 356 to introduce evidence of the other statements by Combs as contextual evidence.[4] Just as it was not an abuse of discretion for the trial court to grant the prosecutor's motion, it was not misconduct for the prosecution to have made it.

---

[4] Defendant also appears to suggest there was prosecutorial misconduct in relation to Combs's alleged statement to Reginald Jones that he " 'already popped me one motherfucker.' " However, the parties stipulated to admission of the statement, which

14

*Ineffective Assistance of Counsel*

Even if the prosecutor did not commit misconduct by "sandbagging" the defense in connection with Combs's statements, defendant claims his trial counsel was ineffective "for failure to be aware that the statements would be admissible under section 356 and either obtain a pretrial ruling on this issue or plan his strategy with the admission of the rebuttal evidence in mind."

"As we have stated in many criminal cases, 'a defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome.' [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 274.) " ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citation.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 954.)

Defendant maintains his trial counsel was "unaware that the challenged [contextual] statements [by Combs] could be admitted under section 356" and failed to "plan[] his strategy based on the potential admission of those statements." The record makes clear, however, defense counsel knew in advance that eliciting Combs's "those bullets were meant for you" statement would mean the prosecutor would be allowed to elicit the contextual statements. In short, defense counsel made a reasonable strategy

---

defendant claimed supported his theory Combs was the shooter. Furthermore, the statement ultimately did little to assist the defense because Jones testified on cross-examination that Combs made the statement three or four weeks before Garcia's murder.

call, which is insufficient to support an IAC claim. (*People v. Stanley, supra,* 39 Cal.4th at p. 954.)

### Combs's Out-of-Court "Had A Gun" Statement

Defendant also claims the trial court erred in admitting a statement Combs made to Edward Wondeh that defendant had a gun and had said to Combs " '[l]et me try it on you, and see how it works.' " The court admitted the statement for the limited purpose of showing Combs's state of mind, and so instructed the jury.

Evidence Code section 1250 provides in part: "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)

Wondeh testified that about three weeks before the murder, he drove Combs and defendant to Jones's home in Berkeley. Combs went into Jones's house, Wondeh went to talk to an acquaintance across the street, and defendant stayed in the car. Combs returned and got in the car with defendant. He then exited the vehicle, appeared angry and upset, and said he was going to walk home. Combs told Wondeh defendant had a gun and had said to him " 'Let me try it on you, and see how it works.' " The statements by defendant to Combs were admitted "for the limited purpose to explain Mr. Combs'[s] then state of mind," not for the truth of the matter.

Defendant maintains this exception to the hearsay rule was inapplicable because Combs's "state of mind towards appellant weeks earl[ier] was completely irrelevant to any . . . matter at issue in the homicide." To the contrary, Combs's state of mind of fear and anger at defendant was relevant to rebutting defendant's defense that Combs was the shooter and directing the action the night of the murder, and he was only an innocent passenger. We presume the jury understood and followed the court's limiting instruction. (*People v. Homick*, *supra*, 55 Cal.4th at p. 853.) Further, even if the trial court abused its

16

discretion in allowing the statement, there was no prejudice. Given the overwhelming evidence of defendant's guilt, it is not reasonably probable the jury would have returned a verdict more favorable to defendant in the absence of this evidence. (See *People v. Benavides* (2005) 35 Cal.4th 69, 91.)

***Instructions on Accomplice Testimony***

Defendant claims the trial court prejudicially erred in failing to instruct the jury that Stewart's testimony and Combs' out-of-court statements required corroboration because they were accomplices and their statements should be viewed with caution. The court denied defendant's request for CALCRIM No. 334 or 335 in regards to Stewart. Defendant made no such request as to Combs, but claims the court should have given such instruction sua sponte.

" 'An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' ([Pen. Code,] § 1111.) If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request. [Citation.] Of course, an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others." (*People v. Brown* (2003) 31 Cal.4th 518, 555.)

Although the trial court had a sua sponte duty to instruct on accomplice testimony, defendant cannot demonstrate prejudice. "Any error in failing to instruct the jury that it could not convict defendant on the testimony of an accomplice alone is harmless if there is evidence corroborating the accomplice's testimony. ' "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." ' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 456.) As we have discussed, the other evidence against defendant was overwhelming. Defendant's friend, Armail Porter, told police defendant admitted to him that he shot Garcia. Francisco Perez, defendant's mother's next door neighbor, testified

17

defendant gave him a gun and his shirt the evening of the murder, and asked him to hold them. Later, defendant asked Perez to dispose of the weapon. Defendant's neighbor, Bobby Lee White, testified defendant told him on the night of the murder he had to "unload his clip" on someone that evening. Defendant testified and corroborated most of the other testimony. He admitted Combs asked for his help in "getting his money" from Estes. He admitted going to the scene of the murder with Combs and Stewart, wrapping the gun in his shirt, asking Perez to dispose of it after the shooting, and leaving town after the murder. In sum, the failure to instruct was not prejudicial.

***Prosecutorial Misconduct***

Defendant claims the prosecutor committed misconduct both in his cross-examination of defendant and during closing argument. " 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.]" (*People v. Dement* (2011) 53 Cal.4th 1, 49.)

Defendant first contends the prosecutor committed misconduct during his cross-examination of defendant by repeatedly asking him if the witnesses whose testimony contradicted his version of events were lying. Our Supreme Court has explained that "were they lying" questions must be considered in context to determine their propriety. "In challenging a witness's testimony, a party implicitly or explicitly urges that because a witness is lying, mistaken, or incompetent, the witness should not be believed. A party who testifies to a set of facts contrary to the testimony of others may be asked to clarify what his position is and give, if he is able, a reason for the jury to accept his testimony as more reliable. [¶] The permissible scope of cross-examination of a defendant is generally broad. 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' [Citation.] A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of

18

the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. [Citation.]' [Citation.] [¶] *A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately.* As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken. *When, as here, the defendant knows the other witnesses well, he might know of reasons those witnesses might lie.* Any of this testimony could be relevant to the credibility of both the defendant and the other witnesses. There is no reason to categorically exclude all such questions. Were a defendant to testify on direct examination that a witness against him lied, and go on to give reasons for this deception, surely that testimony would not be excluded merely because credibility determinations fall squarely within the jury's province. Similarly, cross-examination along this line should not be categorically prohibited." (*People v. Chatman* (2006) 38 Cal.4th 344, 382, italics added.)

"In sum, courts should carefully scrutinize 'were they lying' questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*People v. Chatman*, *supra*, 38 Cal.4th at p. 384.)

Here, nothing in the record suggests the prosecutor sought to present evidence he knew was inadmissible. Indeed, defendant's testimony was admissible because he was a percipient witness with personal knowledge whether other witnesses who described the shooting were testifying truthfully and accurately.

Defendant contends the prosecutor also committed misconduct during closing argument by implying defendant was required to prove his innocence and "attempting to shift the burden of proof to the defense." He points to the prosecutor's statement there was no corroboration or "independent evidence" supporting defendant's testimony.

19

However, defendant did not object to the statements he now claims were objectionable. "To preserve for appeal a claim of prosecutorial or judicial misconduct, a timely objection and a request for a jury admonition is required." (*People v. Elliott* (2012) 53 Cal.4th 535, 554.) In any event, the prosecutor's argument there was no evidence corroborating defendant's testimony was a comment on the credibility of his testimony, not an implication he had the burden of proof.

Defendant also asserts the prosecutor "argued that you would effectively have to find all the other witnesses lied before you could find the appellant not guilty beyond a reasonable doubt." The prosecutor said nothing to that effect. At the page cited by defendant, the prosecutor stated "[defendant] has to say [the witnesses against him] are all lying because all of them together bury him beyond any doubt in this case." The prosecutor indicated the jury "ha[d] to look at all the evidence," and that "all the evidence, taken as a whole, is more than proof beyond a reasonable doubt." These statements do not constitute prosecutorial misconduct.

Defendant further asserts the prosecutor improperly vouched for Combs's truthfulness. He claims the following statements made in closing argument constituted misconduct: "[b]ut we know [Combs] is not the shooter. We know what he told the cops. . . . '[w]e know' about what happened between appellant and Combs . . . ."[5] Again, defendant neither preserved this objection in the trial court (*People v. Elliott, supra,* 53 Cal.4th at p. 554) nor demonstrates misconduct in this court. Simply stating "we know" certain facts in closing argument is not equivalent to " 'plac[ing] the prestige of [the prosecutor's] office behind a witness by offering the impression that [he] has taken steps to assure a witness's truthfulness at trial.' " (See *People v. Ward* (2005) 36 Cal.4th 186, 215.) Read in context, "we" referred to the jurors and others who heard the evidence at trial, not the prosecutor's office.

Defendant next asserts the prosecutor improperly argued evidence admitted for the limited purpose of showing Combs's state of mind as demonstrating defendant, in fact,

---

[5] Defendant's purported quote is not entirely accurate.

"had the gun." Again, there was no objection and no misconduct. The prosecutor argued "you know the gun was in the defendant's possession before the 1st. Nicole Stewart testified to that. Armail Porter told you to that. [¶] What else? . . . You've got [Edward] Wondeh . . . [h]e sees Combs go into Jones'[s] house, comes out, doesn't have anything in his hands, gets in the vehicle with the defendant, just the two of them. Just shortly thereafter, Combs is out of that vehicle, he's upset, he's angry. What does he tell Mr. Wondeh? Gets his gun, he points it at him and says 'We'll try it out on you.' . . . [¶] The only logical and common sense inference that you can draw is that's the gun that Combs brokered, he got it from Mr. Jones, and he gave it to the defendant." The prosecutor's argument was directed toward the inferences to be drawn from Combs's actions and state of mind, not the truth of Combs's statement. And, there was no prejudice, in any event, given the other evidence defendant had the gun prior to the shooting.

Defendant also contends the prosecutor improperly attacked his attorney in closing argument. The defense objected[6] after the prosecutor stated: "Again this is just smoke. It's misdirection on the part of [defense counsel] trying to mislead you on stuff." "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302 & fn. 47 [accusing defense of attempting to hide the truth, and using "ink from the octopus" metaphor several times during closing argument not misconduct].) As in *Cummings*, "the context was such that the jury certainly would understand it to be nothing more than urging the jury not to be misled by defense evidence." (*Id*. at p. 1302.)

Defendant similarly claims the trial court erred in denying his motion for mistrial on the ground of prosecutorial misconduct. For all the reasons we have discussed, the

---

[6] The Attorney General states Williams "fail[ed] to object to this argument as misconduct." His defense attorney objected that "I'm not trying to mislead the jury," but was overruled.

21

trial court did not abuse its discretion in denying the motion for mistrial on that basis.[7] (*People v. Ayala, supra*, 23 Cal.4th at p. 283.)

### Cumulative Error

Defendant lastly asserts the alleged errors cumulatively compromised his due process rights and were prejudicial. As the court in *People v. Cole* stated " 'We have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235–1236.)

### DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

---

[7] Defendant acknowledges his counsel did not object to every alleged instance of misconduct, but maintains to the extent an objection would not have been futile, his counsel was ineffective. Because we conclude there was no prosecutorial misconduct, we likewise conclude his counsel was not ineffective in failing to object.